UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUSTIN LEWIS, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>ADVANCE MAGAZINE PUBLISHERS INC. d/b/a NJ.COM,<br><br>  Defendant. | Case No. 1: 25-2269<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Justin Lewis ("Plaintiff"), on behalf of himself and all others similarly situated, brings this class action suit for damages and injunctive relief against Defendant Advance Magazine Publishers Inc. d/b/a NJ.com ("Defendant," "Advance," or "NJ.com"). Plaintiff alleges the following based upon personal information as to allegations regarding himself, and on his own investigation, on the investigation of his counsel, or on information and belief as to all other allegations:

## NATURE OF THE ACTION

1. Plaintiff brings this action against Defendant for disclosing consumers' identities and video viewing history to Meta Platforms Inc. ("Meta") in violation of the Video Privacy Protection Act ("VPPA").

2. The VPPA prohibits "video tape service providers," such as Defendant, from knowingly disclosing a consumer's personally identifiable information ("PII")—in particular, "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider"—unless the consumer expressly consented to the disclosure in a standalone consent form.

3. Defendant shares consumers' personal information with Meta through the "Meta Pixel," a tracking technology embedded in its website. The Meta Pixel is a snippet of programming code that, once embedded, surreptitiously transmits user data to Meta.

4. When a consumer views prerecorded video content on Defendant's website, the Meta Pixel captures data from "events," which Meta defines as "actions people take on your website."[1] This event data includes details about the consumers' interactions with the website, such as their video engagement and browsing behavior. Defendant then transmits this data to Meta in a packet containing both PII and specific user actions, which Meta stores and processes on its servers.

---

[1] https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed March 19, 2025).

5. The information that Defendant shares with Meta includes the consumer's unique Facebook ID ("FID") and the Uniform Resource Locators ("URL") identifying which prerecorded videos the consumer viewed. A consumer's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the consumer.

6. Defendant discloses the consumer's FID and viewing content to Meta together in a single transmission. Because the FID uniquely identifies an individual's Facebook account, Meta, as well as any other person, can use the FID to quickly and easily locate, access, and view that person's corresponding Facebook profile. In simplest terms, the Meta Pixel allows Meta to know what video content one of its members viewed on Defendant's website.

7. Defendant also uses a wide array of tracking technologies to share information about users' use of its websites.

8. Consumers do not consent to such sharing by Defendant through a standalone consent form, as required by the VPPA. As a result, Defendant violates the VPPA by disclosing this information to Meta.

## THE PARTIES

9. Plaintiff is a resident of Neptune, New Jersey. Plaintiff signed up for an account on NJ.com in or around 2020 or 2021. Plaintiff has watched videos on NJ.com, including by using a Google Chrome browser. Plaintiff has a Facebook account which he has been logged into at the same time he watched videos on NJ.com.

10. Defendant Advance Magazine Publishers Inc. d/b/a NJ.com is incorporated in New York and maintains its principal place of business at One World Trade Center, New York, NY 10007.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710.

12. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class, including Plaintiff, are citizens of different states than Defendant.

13. Plaintiff is requesting statutory damages of $2,500 per violation of the VPPA, which when aggregated among a proposed class that numbers in the thousands, far exceeds the $5,000,000 threshold for federal court jurisdiction under the Class Action Fairness Act.

14. This Court has personal jurisdiction over Defendant because Defendant is incorporated in New York, headquartered in New York, New York, regularly conducts business in this Judicial District, and has extensive contacts with this forum.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant transacts substantial business in this District.

**FACTUAL ALLEGATIONS**

**I.   Common Allegations**

16. The VPPA was enacted in 1988 in direct response to concerns over the unauthorized disclosure of an individual's video viewing history. During the confirmation hearings of Judge Robert Bork, a local newspaper obtained and published his video rental history, highlighting the ease with which personal information could be accessed and disclosed without consent. This incident underscored the need to create legal protections of personal privacy in the context of video viewing.

17. Congress responded by passing the VPPA, designed to prevent the unauthorized disclosure of video viewing information. The law prohibits "video tape service providers" from sharing PII about consumers without their informed, written consent. The statute requires that any

consent to disclose such information must be clear, distinct, and separate from other agreements, establishing a robust standard for privacy protection.

18. NJ.com is a digital news platform that serves as the home, digital or otherwise, for many New Jersey newspapers, such as *The Star-Ledger*, *The Times of Trenton*, and *The South Jersey Times*. These newspapers have transitioned exclusively to digital formats, requiring readers to access content through NJ.com.

19. Among its content offerings, NJ.com hosts a substantial amount of video content across numerous webpages ("Video Pages"), including high school sports coverage, news clips, and other prerecorded video content. Access to these videos often requires users to create and log into an NJ.com account.

20. Videos on Defendant's Video Pages autoplay upon a user's entry, meaning that simply loading the page triggers video playback. Thus, when a user enters a Video Page, it is reasonable to conclude that they have viewed the video presented on that page.

21. Defendant employs an array of tracking technologies—"web beacons, web bugs, internet or pixel tags, clear GIFs, digital fingerprinting . . . and similar technologies"—throughout its website. *See Advance Local Privacy Policy* last updated December 31, 2023. These mechanisms allow third parties, including Meta, to gain access to Class Members' data and communications, including their video viewing history.

22. The Privacy Policy explicitly outlines how these data points are collected and used for commercial purposes:

> We and our third party business partners, use Tracking Technologies on the Service for purposes of "online behavioral advertising" (OBA). OBA allows the serving of advertisements tailored to perceived interests inferred by your browsing on the Service and on other sites, applications, destinations, and services, over time and across unaffiliated websites, apps, and services, using the same or a different device. To enable OBA, we and our third party business partners, independently use Tracking Technologies to collect certain

information, some of which may be deemed personal information, including for example the make, model, settings, specifications (e.g., CPU speed, connection speed, browser type, operating system, device identifier, online identifier) and geographic location of your device, as well as date/time stamp, IP address, pages visited, time of visits, content viewed, ads viewed, the site(s), application(s), destination(s), and/or service(s) you arrived from, and other clickstream data.

23. Defendant's transmission of viewing information to Meta includes the URL identifying the specific video viewed by the consumer, as well as the consumer's FID which is a string of numbers unique to each Facebook profile that personally identifies the member.



24. Anyone who possesses a FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile by simply visiting www.facebook.com/[the user's FID]. Facebook profiles contain large amounts of personal information.

25. A Facebook profile typically shows the Facebook user's name, gender, place of residence, career, educational history, a multitude of photos, and the content of the user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may

disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

26. Just as Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Thus, equipped with a FID and the video content name and URL, any ordinary person could determine the identity of the NJ.com member and the specific video or media content they viewed on Defendant's website.

27. Defendant transmits the FID and video title to Meta in a single transmission, through the Meta Pixel. The Meta Pixel is a snippet of a programming code that, once installed on a webpage, sends information to Meta. This transmission occurs when a member views a prerecorded video on Defendant's website.

28. The Meta Pixel is an advertising tool that allows website owners to track visitor actions on their websites for the purpose of sending the corresponding information to Meta; websites use the Pixel in hopes of better targeting their products and services on Facebook to interested consumers. Thus, a business such as Defendant chooses to install the Pixel on its website in order to increase its profits.

29. According to Meta's documentation, the Meta Pixel allows it "to match your website visitors to their respective Facebook User accounts" and that "[o]nce matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[2] Defendant, by integrating the Meta Pixel into its site, has chosen to share data with Meta to enhance its advertising effectiveness and increase its profits.

30. Defendant knew that by installing the Pixel on its website, the Pixel would send Meta information identifying website visitors and their video-watching habits.

---

[2] https://developers.facebook.com/docs/meta-pixel/get-started (last visited March 11, 2025).

31. Meta's website explains that, to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website."[3] Defendant made the conscious decision to undertake this installation process.

32. Meta benefits from websites like Defendant installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from providing more targeted ads. The Pixel is installed on a variety of websites and, accordingly, provides Meta with information about its users' preferences, other distinguishing traits, and web browsing activities outside of Meta-owned platforms.

33. Using the Meta Pixel likewise benefits Defendant's business by improving its ability to promote its content and services to its members, thereby increasing its profits.

34. Through the use of the Meta Pixel, Defendant discloses to Meta the full name of each video a person watched, together with the person's FID, thus linking members' viewing content choices and preferences to their Facebook profiles.

35. To illustrate, Defendant has configured the Meta Pixel to collect and transmit two specific types of event data—PageView and ViewContent—whenever a user visits a Video Page. Both events capture and transmit the full URL of the visited page, while the ViewContent event conveys additional custom parameters about the content being viewed. These custom parameters include data fields such as "article_content_tier", "content_category", "content_id", "content_type", "is_registered", and "is_subscriber."

---

[3] https://www.facebook.com/business/tools/meta-pixel/get-started (last visited March 11, 2025).

36.     Each time a user accesses a Video Page, Defendant's Meta Pixel transmits this information to Meta. For instance, when a user visits a page featuring a recorded high school sports game, the Pixel logs that the user has entered a page categorized as "Watch Video Page" and whether they are a registered user, subscriber, or non-subscriber:



37.     Attached to these transmissions of PageView and ViewContent event data are cookies used by Meta to identify users, including the c_user cookie:



38.     The c_user cookie contains the user's unique, unencrypted FID, a numerical identifier assigned to every Facebook account, enabling Meta—and anyone else in possession of the FID—to associate the transmitted data with a specific individual's Facebook profile.

39.     An FID is directly linked to a user's profile, which typically includes the person's full name, profile picture, location, occupation, educational background, posts, and other personal details. Anyone who obtains an FID can simply append it to Facebook's URL structure

(www.facebook.com/[FID]) to locate and view the corresponding profile. Therefore, Defendant's transmission of PageView and ViewContent event data, combined with the c_user cookie, provides Meta with a detailed record of users' video viewing histories, linked to their identities.

40. Defendant violates and invades the privacy rights of consumers with its practice of sending their FIDs, together with their viewing content, to Meta. Plaintiff and Class Members did not know of or consent to Defendant's disclosure of their prerecorded video requests and their identities to Meta.

41. Meta derives significant financial and strategic benefits from the widespread adoption of the Meta Pixel. The tool enhances its ad-targeting algorithms, allowing Meta to refine user profiles and deliver more precisely tailored advertising, thereby increasing engagement and maximizing ad revenue. The Pixel also enables businesses to track conversions and retarget users across Meta's platforms, reinforcing Meta's dominance in digital advertising. Even when businesses do not directly advertise with Meta, the Pixel allows it to collect and aggregate vast amounts of user data, further strengthening its market power.

42. Defendant's integration of the Meta Pixel similarly benefits its own business interests. By leveraging Meta's data-driven advertising ecosystem, Defendant can better promote its content and services to its audience, ultimately driving user engagement and subscription revenue. NJ Advance Media, the operator of NJ.com, describes itself as "a data-driven marketing agency and the #1 provider of local news in New Jersey," emphasizing that its "data and technology allows [it] to segment audiences into targetable groups meaningful to your business."[4] The Meta Pixel enables Defendant to refine its marketing efforts, ensuring its content reaches the users most likely to subscribe or engage— users whose attention Defendant then monetizes by selling targeted advertising access.

---

[4] https://www.njadvancemedia.com/about/ (last visited March 11, 2025).

43. Defendant knowingly discloses users' identified video viewing history without obtaining their informed, written consent in a standalone format. The VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. At no point was Plaintiff or any other NJ.com website visitor given a standalone, distinct consent form disclosing Defendant's practices at issue and requesting consent. Hence, no individual consented to Defendant's offending practice of sharing video preferences with third parties.

44. Defendant shared with Meta the personal information of Plaintiff and Class members, including their video-viewing histories and associated FIDs, which they reasonably expected would be kept private.

45. Defendant's practice of sharing consumers' personal information and prerecorded video content with Meta without their consent, and its failure to disclose this practice, caused Defendant to profit from advertising revenue it would otherwise not have received.

**II.    Plaintiff's Allegations**

46. Plaintiff has an account with NJ.com and has had the account since 2020 or 2021.

47. In exchange for access to an NJ.com account, Plaintiff provided to NJ.com his email address, name, and other requested information.

48. Plaintiff used his internet-connected device and the browsers installed on that device to visit and watch video content on NJ.com during the Class Period as defined herein.

49. Plaintiff is a Facebook user. Plaintiff's Facebook profile includes his name and other personal details.

50. Plaintiff visited Defendant's website to request and watch prerecorded video content while logged in to Facebook.

51. Defendant sent Plaintiff's PII, including his FID, as well as the URL identifying each prerecorded video he viewed, to Meta without obtaining his consent through a standalone consent form.

52. Plaintiff values his privacy while web-browsing and watching videos.

53. Plaintiff's viewing preferences constitute personal information of a private and confidential nature and are assets to which no third party has a presumptive right to access.

54. Plaintiff sought to arbitrate his claim against NJ.com in the American Arbitration Association ("AAA") pursuant to NJ.com's User Agreement in effect when Plaintiff had last visited NJ.com's website in April 2024. However, NJ.com refused to participate in the arbitration, so the AAA closed the arbitration proceedings. As a result, NJ.com has waived its right to require Plaintiff or the Class Members to arbitrate their claims. Therefore, Plaintiff brings this action in court.

## TOLLING

55. Any applicable statute of limitations is tolled under the "delayed discovery" rule. Plaintiff had no knowledge—nor any reasonable means of discovering—that his information was being transmitted to third parties without consent.

## CLASS ACTION ALLEGATIONS

56. Plaintiff brings this lawsuit as a class action under F.R.C.P. 23.

57. Plaintiff proposes the following class:

> Any renter, purchaser, or subscriber of goods or services of Defendant in the United States who viewed prerecorded video content on NJ.com during the Class Period and had a Facebook account at the same time.

58. The "Class Period" is defined as two years prior to the date of the filing of this action plus any applicable tolling, through the date of final disposition of this action.

59. Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2)

the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability.

60. **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of the Class is currently unknown to Plaintiff at this time; however, Plaintiff believes there are thousands of Class Members.

61. **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

   a. Whether Defendant's use of the Meta Pixel was without consumers' consent or authorization;

   b. Whether Defendant obtained and shared or caused to be obtained and shared Plaintiff's and Class Members' personal information through use of the Meta Pixel, which Defendant installed on its webpages;

   c. Whether third parties obtained Plaintiff's and Class Members' personal information as a result of Defendant's conduct described herein;

   d. Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*; and

   e. Whether Defendant should be enjoined from engaging in such conduct in the future.

62. **Typicality**: Plaintiff's and Class Members' video viewing history was transmitted by Defendant to Meta without their consent and the injuries are typical to all Class Members.

63. **Adequacy**: Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom Plaintiff is similarly situated, as demonstrated herein. In addition, Plaintiff's attorneys, the proposed class counsel, are well versed in the rules governing class action

...
...

discovery, certification, and settlement. The proposed class counsel are experienced in handling claims involving violations of the VPPA.

64. **Predominance**: The questions of law or fact in this case are common to all Class Members and predominate all their claims. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

65. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

   a. Class-wide damages are essential to induce Defendant to comply with the law;

   b. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct;

   c. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims;

   d. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law;

   e. Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger;

   f. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy;

66. Plaintiff and Class Members have suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods because as individuals, Class Members have no way of discovering that Defendant transmitted their viewing history to Meta without their knowledge or consent.

67. The Class may also be certified because:

   a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant;

   b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

   c. Defendant has acted, or refused to act, on grounds generally applicable to each Class, thereby making appropriate final and injunctive relief with respect to the members of each Class as a whole.

68. This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class Members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

69. The joinder of Class Members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court. The Class Members can be identified through Defendant's records.

**COUNT I – Violation of the VPPA, 18 U.S.C. § 2710**

**(On Behalf of Plaintiff and the Class)**

70. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein and further alleges as follows.

71. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

72. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

73. Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering audiovisual materials through its online platform, including the prerecorded videos that Plaintiff viewed, which are similar to prerecorded video cassette tapes. Defendant's delivery of video content affects interstate and foreign commerce.

74. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

75. Defendant knowingly caused personal viewing information, concerning Plaintiff and Class Members, to be disclosed to Meta. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Meta, as individuals who viewed Defendant's video content, including the specific prerecorded video materials each such individual watched on Defendant's website. This information allowed Meta to identify Plaintiff and each Class Members' specific individual video-viewing preferences and habits.

- 15 -

76. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff signed up for an NJ.com account and is, therefore, a subscriber of goods or services from Defendant. Hence, Plaintiff is a "consumer" under this definition.

77. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent under this definition.

78. Defendant was aware that the disclosures to Meta identified Plaintiff and Class Members. Defendant also knew that Plaintiff's and Class Members' personal viewing content was disclosed to third parties.

79. By knowingly disclosing Plaintiff's and Class Members' personal viewing content, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy in their prerecorded video watching habits. *See* 18 U.S.C. § 2710(c).

80. As a result of the above violations, Defendant is liable to Plaintiff and the Class Members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the VPPA, Defendant also is liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendant in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, prays for relief and judgment against Defendant as follows:

A. certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B. declaring that Defendant is financially responsible for notifying Class Members of the pendency of this suit;

C. declaring that Defendant has committed the violations alleged herein;

D. awarding Plaintiff and the Class statutory damages under the VPPA;

E. for punitive damages;

F. for injunctive relief;

G. awarding Plaintiff and the Class the costs of prosecuting this action;

H. awarding Plaintiff and the Class reasonable attorneys' fees and costs as allowable by law;

I. awarding pre-judgment and post-judgment interest; and

J. granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 19, 2025            **JANOVE PLLC**

By: */s/ Raphael Janove*
Raphael Janove
500 7th Ave., 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law

Ben Travis
**Ben Travis Law, APC**
4660 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Phone: (619) 353-7966
ben@bentravislaw.com

*Attorneys for Plaintiff and the Proposed Class*

- 18 -